Good morning, Your Honor. Deputy Attorney General James Flynn for Parole Agent Mora. The question in this case is whether the district court erred in denying qualified immunity for Parole Agent Mora based on her reasonable mistake that Mr. Willis was on parole at the time. First, this court has jurisdiction because on the facts viewed in the light most favorable to the plaintiff, her mistake was a reasonable one. She was entitled to rely on the information as to his parole status in the parole roster until such time as she had information that that entry was incorrect. When she did get that information during the search, when Mr. Willis showed her a card that indicated he had been discharged from parole, she ceased her activity, went down and did a double check with Sacramento I.D. Warrants and found out that he had been discharged, and then she left the premises. She didn't do anything else. Now, while she was gone, the police who had accompanied her conducted a search of the briefcase that ultimately led to Mr. Willis' arrest. She had nothing to do with that. In fact, she was not even the person who handcuffed Mr. Willis. That was one of the police officers. Now, the facts here seem to be that this list was, what, updated every two weeks. Is that right? Correct, Your Honor. But it didn't show when any of these people were going to be discharged from parole. So you could assume that some of them are going to be discharged while the list is in effect.  It's possible, but there's two problems with that. One of the problems is that that kind of potential error didn't apply to Mr. Willis because he had actually discharged nine months before. So updating that list would not have had any effect in the case of Mr. Willis. It would have been some kind of random error in his case. Systemically, the list was subject to that kind of criticism, and perhaps in general one should not rely on that sort of list for this purpose. The second answer is? I mean, it seems to me this case breaks down into a lot of relatively difficult fact questions. Well, the second question, Your Honor, the answer to that is that Agent Mora had never found the list to be inaccurate. She had no – she didn't prepare the list. She wasn't responsible for updating it. She wasn't responsible for correcting it. And she didn't know exactly how that list was put together, but she did know that whenever she had used it in the past, she had not found it to be in error. And, in fact, the plaintiff never introduced any evidence that there were any other errors on that list or any other list of a systemic kind, a routine, repeated kind. This is the only one in her experience. So she had no reason to doubt the information on the list and to effectively double-check. Isn't that a factual issue? No, I – well, two questions, two answers to that. One, it's not a factual issue you can draw from the – based on those facts I just gave you, you can't infer that she should have known that the list was inaccurate simply because it was two weeks old. You couldn't just as easily infer that there were no mistakes on that list. And, in fact, she had never seen a mistake before. So – This was a hotel room, motel room? It was a motel room. The local narcotics task force had received a tip from a motel employee. I'm just trying to figure out – It was a motel room. So she's with two local police officers? She happened to be in the local narcotics task force office at the time they got the tip that there was unusual activity. So this group of three goes to the door? There was two police officers, one county sheriff in her. Okay. This group goes to the door. Right. There's someone knocks on the door, and did Mr. Willis come to the door? Deputy Sheriff Hood knocked on the door, said it was Bill. Mr. Willis said, Bill who? He said, Bill with the police. Mr. Willis said, it better be. He opened the door. He was wearing a large hunting knife and a sheath on his belt, so the police – Officer Mullins handcuffed him, and at that point is when he said – They said it was a parole search. He said, I'm not on parole. I've discharged. And at some point shortly thereafter, he shows them his – A card that he had been given. Indicates he's been discharged. That's right. No search was undertaken? No, not at that point. No. At that point, Officer Mullins went out on the balcony of this motel outside the room with Mr. Willis and Officer Silvius and Deputy Sheriff Hood remained inside with a female companion, Mr. Willis. In the room was a black briefcase. I'm just trying to get the sequence as it pertains to this complaint. It shows the card, I'm no longer on parole. Right. Someone then checks with – Agent Mora goes downstairs, attempts to call another parole agent. The name had been on the parole roster as being responsible for investigating whether the supervision of Mr. Willis' parole was going to be transferred from one county to another. That's what the entry next to his name was. And discovers that the card is correct. Discovers. She can't reach the parole, that parole. She calls I.D. Warrens, and they say he's – I don't need all 19 chapters. I'm trying to get to the conclusion here. Finds he's not on parole. Not on parole. Confirms what Willis has told the officer. Right. And in terms of the parole search, nothing further is done. While she's gone doing that, the female companion tells one of the officers in the room that she's been using meth that day and her pipe is in the locked briefcase. And they open the briefcase while she's gone. But in terms of any parole search, it's over. It's over. Yes. She doesn't do a parole search. In fact, she doesn't participate in the search at all, does she? No. She's not present at the time. Okay. All right. Thank you. Good morning, Your Honor. Mary Jagman for the plaintiffs. So what'd she do wrong? I beg your pardon? What did she do wrong? Well, you're looking at 1996. In 1996, a parole search needed to have a parole officer. And a true per they and it had to be a true probation or parole search, not a subterfuge search that would stand in for a search warrant. And I think one of the things that is a factual issue in this case is whether or not the fact that she relies on this list when what she could have done was they maintained that Mr. Willis' parole officer was actually in the Bakersfield office. He never was. But she thought that he was. So she could very easily have just checked with them. That's one of the things that you do. Or, for short, she could have checked with ID warrants instead of which. Which one should she have done? I beg your pardon, Your Honor? Which of those checks should she have made? All of them. I mean, do you want us to hold it unless you check with a central database? You're subject to a lawsuit? Well, here you have. If the parole officer is down the hall, do you have to go and ask the parole officer what to do specifically to verify the status of the individual? You make sure, because if the person's not on parole, he's a citizen with the full panoply of the Fourth Amendment rights. I understand all that. And you make sure. But you're asking us to say that what she did was unreasonable. But my question is, what specifically should we require that she do to make her make this search reasonable? Well, I believe that she should have pulled California ID warrants. It was something that only a parole officer could do. In other words, that should be the universal rule from now on. You've got to do it. That is ñ well, actually, there's no longer a universal rule because you've got Sampson and Knights. But back then, she should have undertaken to ensure that he was on parole. Because if he wasn't on parole, they're violating his Fourth Amendment rights in a very serious way. So what are the factual issues? Well, I think the factual issue is whether or not she had ñ I think a jury could infer from her looking at an outdated, not very well-kept list. I mean, it's just ñ it's really just given as a courtesy to the Bakersford Police Department. She has ñ the factual issue is that a jury could infer that her not going that extra effort, not taking any steps whatsoever beyond looking at this list that Mullins showed her, that she was basically a stalking horse for the police. And that doesn't exist anymore, but it did back then. She's the subterfuge. She enables them to conduct a search without a search warrant. They didn't have enough for a search warrant because all they had was that there were a lot of calls to the room. So Mullins puts ñ Was it clearly established that a subterfuge search is unconstitutional? At that period of time, the issue was whether ñ we can't ñ we're not ñ I don't think you can view this particular search from what is the law now. But at that particular time, the question was whether or not a search was a real parole officer member or whether it was a subterfuge search. It was in lieu of a search warrant for the police. And here you have a really significant factual issue as to what she was really doing, which is just ñ Let's suppose ñ hypothetical question to follow. Let's suppose same facts, same group of officers, they're looking for Mr. Willis. They go to the hotel. They knock on the wrong door. And a man comes to the door, garbed the same way Willis was, with a knife on, et cetera. And they said, we're looking for Willis. And he says, I'm not Willis. And my wallet's right there on the table. And they pull out the driver's license. It's not Willis. And they take a few minutes to check to determine that this is a valid driver's license and the picture matches and that there are no wants or warrants for this guy. And then the same ñ while they're doing that, the same thing happens. The female companion says, oh, we've been smoking dope and the pipe is in the thing. Would the result be any different? I think the result would be different if ñ well, I think the law as it was and probably as it still is, is that if someone ñ if a police officer went to someone's They think they're there for a parole search and they think it's Willis' room, but they're at the wrong room. I haven't thought about that, so I can't answer it because my answer is only with respect to Mr. Willis, which is that the law at the time held that at the point that you open the door, at the point you open the door, that's when the search starts. And so by the time ñ and I think that's a case I've cited in here for that proposition. And I believe that at the point that once you'd authorized this, what I would call a subterfuge search, when they got to the room and Mons asked Willis didn't want to open the door, but he does because he's commanded to. At that point, because of the law as it existed then and does now, I believe, the search began. So if they see something that they don't like, then they already saw something that they didn't like. There were some sort of scales or something on it. It's an illegal ñ it's either an illegal search or a legal search. So in this case, it's an illegal search unless ñ Are you telling me that if the door had opened and he'd had a sidearm on, they couldn't have done what they did with respect to the knife? It would have been ñ well, I don't think that was the issue. The issue was the fact that they had some kind of drug paraphernalia that the woman who was staying there while he went, she borrowed his car. She'd left some kind of drug paraphernalia on the side, one of those chest of drawers that are in motel rooms. My point is that this is not ñ if it's an illegal search, even if something's in plain view, and the illegal search starts when you open the door of a motel room. That's not what we're here about. What we're here about is what Your Honor was asking about that. I'm saying that in this case, you have an illegal search because of not a valid parole search, and that she didn't have ñ she doesn't have qualified immunity because it wasn't reasonable for her to rely on that list. And that's what it really boils down to, and that it wasn't reasonable for her to allow them to continue with the parole search once he'd shown her the card. And what she did was she just left the offices there, because they're supposed to be helping her with the search at that point in time. Your Honor told me specifically what she should have done, though, to elevate her investigation. She should have checked to be sure that the list ñ she should have gone beyond the list. That's my view. She should have ñ and I believe that legally, legally she should have gone beyond the list, because that's not reasonable. It's unreasonable for her to have done that. When she got to the room and she actually saw his card, it wasn't reasonable because this is a parole search, and it's run by the parole officer. Once she saw his card, officers should have come out of the room, and that should have been the end of the story until she found out whether or not he was on parole. He's a citizen. He's not on parole, and he has his Fourth Amendment rights, and they were violated by this parole search.  All right. Thank you. Thank you, Your Honor. I'm very brief, Your Honor. This case is ñ the way the district court approached this case and the way plaintiffs have argued this case is very similar to what the Supreme Court said in Hunter v. O'Brien is the wrong way to approach qualified immunity, and that is to ask whether an officer who acts reasonably should have done something else that may also have been reasonable. But the question is whether what they did at the time with the facts they had was reasonable, not whether there were two or three other options. Yeah, whether it was reasonable, and that's a factual issue. Yeah, whether conduct is reasonable or not, it goes to the jury. Well, that's exactly what Hunter v. O'Brien said. It does not go to the jury, Your Honor. They said that was what was wrong with this Court's approach in the case that Hunter v. O'Brien overturned. Well, you've got a factual issue. Not on the undisputed facts. It's undisputed that what she did was based on what she knew at the time. And all she knew at the time was that the list she was using had always been accurate. There was no reason for her to go question that it was accurate. And the case law didn't require her. Clearly, there's no case law in this circuit or any other that required her to go check. You see, before all this business started with qualifying immunity, there was a defense that if an officer acted reasonably and in good faith, that was the end of the case. Correct. And those trials would take a few hours, that's all. But now, in order to shortcut this, we have this complexity added onto it of qualified immunity. And it takes longer to get through all of that than to just put on a little trial that would have been over with probably in less than a day. You're talking about probably what I think Judge Hawkins talked about in his dissent in the Redding case, which is what's pending in front of the Supreme Court right now in the Pearson v. Callahan case, which is whether or not this Court and other circuits can short circuit the inquiry, assume there was unreasonable activity, and then jump to the second question, which is whether the law was clearly established. We say it wasn't clearly established here, that she had any obligation to go beyond what she did. So, I mean, that, I think, is your question. And maybe the Supreme Court's going to help you out on that by changing the sauté rule to allow the Court to exercise discretion as to whether it wants to decide whether the factual matter, and then go to the law question or simply assume that and ask the law question and not try to make law in a complicated factual situation. That's what I think Pearson v. Callahan is about. Well, that would probably continue the complexities. You know why? No, Your Honor. It makes business for lawyers. Thank you, Your Honor. Charles Dixon said that that was the overarching principle of the English law, and that was to always keep itself in business. And you'll get that if you read Bleak House. Very interesting. Thank you, Your Honor. Yeah, and true. All right. Okay. Tapia v. Ferraro v. Mukasey.
judges: Pregerson, Hawkins, Cudahy